[Filed June 10, 1885.]

## JOSEPH MANAUDAS v. S. A. HEILNER AND E. D. COHN.

CONTRACT — MORTGAGE.—The contracts between the parties construed, and held to constitute a mortgage.

WASCO COUNTY.    Defendants appeal.    Decree modified.

*L. O. Sterns.* and *Bonham & Ramsey*, for Responden..

*L. L. McArthur* for Appellants.

THAYER, J.—This suit was originally begun in Baker County. The venue was changed to suit the convenience of the parties to said county of Wasco. The suit was to compel an accounting, and to decree a recovery of certain real and personal property from appellants to the respondent. It appears from the proofs and pleadings in the case that the appellants, for some time past, have been engaged in merchandising in the county of Baker, and that the respondent has been engaged in mining there; that the respondent some years ago opened an account with appellants, and with other mercantile firms doing business in that county, with which the appellants had partnership connections; that on the 26th day of March, 1878, the respondent was indebted to appellants on account in the sum of $1,981, and thereupon made an absolute transfer to them of a large amount of real and personal property, consisting of mining claims, flumes, etc.; also a lot in Baker City, in said county, and certain personal property; and that on the 27th day of March, 1878, said appellants and respondent entered into a written agreement relating to the said transfer of said property,

and which evidently was a part of that transaction, of which agreement the following is a copy:—

"This agreement, made this 27th day of March, 1878, between S. A. Heilner and E. D. Cohn, of Baker County, Oregon, and Joseph Manaudas, of the same place, witnesseth: That whereas, on March 26, 1878, said Manaudas sold and conveyed by bill of sale, for consideration mentioned of $1,000, to said Heilner & Cohn, a large number of placer mining claims, flumes, structures, house on claims, blacksmith tools and appurtenances, stock, cattle, and horses, known as the Leatherwood mining and other property, situated on Quartz Gulch, and other places in Shasta and Willow Creek mining district, in Baker County, Oregon; and also conveyed, by deed executed by himself, certain ditches and water rights, flumes, and property to said Heilner & Cohn, for consideration mentioned at $561, at same date, said ditches and water-right property being known as the Leatherwood ditch and water-right property, in and about said Shasta mining district, in said county and State, said property and bill of sale and deed being of record in the clerk's office in Baker County, Oregon.

"And whereas, on said date, one Peter Mann, for consideration of $325 expressed, executed his deed to said Heilner & Cohn for lot 2, in block 2, of Fisher's addition to Baker City, Oregon, with tenements and appurtenances, which deed is of record in said county, said considerations being debts for the most part of said Manaudas, assumed, paid, and settled by the said Heilner & Cohn for the said Manaudas, amounting in the aggregate to $1,886 and interest, amounting to $95; total, $1,982.

"Now, therefore, it is agreed by and between the parties that, if the said Manaudas shall repay the said amount of $1,980 in gold coin to the said Heilner & Cohn, with twelve per cent per annum interest thereon, from date hereof, in manner and form as follows, to wit, on or before January 1, 1880; and said Manaudas promises to pay the said sum from and out of the gold extracted and cleaned up from the working of the said mines, or part thereof, so conveyed to said Heilner & Cohn, and hereinafter let to said Manaudas, who hereby covenants to work

some part of said mines, or all that may be practically or profitably worked, at his own expense in all things, in workmanlike manner, with diligence, economy, and dispatch, to the end that said payment of said sum may be made as early as possible before the said date. And in consideration of the premises, and one dollar to them paid by said Manaudas, the said Heilner & Cohn let the said mines, mining property, ditches, water rights, and interests to the said Manaudas for the term of two years, to be worked and operated by him at his own expense, in a workmanlike manner, according to the customs, laws, and usages of said mining district, and of the State and of the United States, to the end that the title thereto shall be protected from forfeiture, and at every clean-up the net proceeds of gold extracted from the working of said mines shall be immediately paid over to said Heilner & Cohn, to be applied by them towards payment of said sum until said sum is fully paid; and when so paid, or· if paid in any other manner by said Manaudas before said January, 1880, that then said Heilner & Cohn agree to reconvey· all the said property to the said Joseph Manaudas, or such right or title as they may then have therein.

"And it is agreed by parties herein that in case of the failure· of the said Manaudas to pay the said sum, or make substantial default herein, that then said deeds and bill of sale shall become absolute at the option of said Heilner & Cohn, who may enter and take peaceable possession thereof from the said Manaudas, and sell and dispose of the same as they may deem best."

It appears that after the execution of the above agreement the said respondent continued to deal with the said appellants, and with other firms with which they were connected in business, and purchased from them goods, wares, and merchandise, and' they advanced him money and paid money at his request, and. for his use, and that respondent in return paid to appellants· gold-dust and money; that they continued their mutual dealings until some time in July, in the year 1880, when the appellants, with the knowledge and consent of the respondent, entered into a written agreement with one W. B. Benson in regard to certain of the property transferred to them by the respondent,

and referred to in their said agreement of March 27, 1878, before set out. The latter is as follows:—

"This agreement, made and entered into the ——— day of July, 1880, between S. A. Heilner and E. D. Cohn, of Baker City, the parties of the first part, and W. B. Benson, of the same place, the party of the second part, witnesseth: That the parties of the first part, in consideration of the covenants and agreements on the part of the said party of the second part, hereinafter contained, agree to sell unto the said party of the second part the following described placer mining ground, and water rights and ditch property, situate in Shasta mining district, Baker County, Oregon, to wit [here follows lengthy description of the property], for the sum of $8,000, and the said party of the second part, in consideration of the premises, agrees to pay to the said parties of the first part the said sum of $8,000, in manner following, to wit, $1,000 on the execution of these presents, and as to the other payments the party of the second part agrees to take possession of said mining property, and with a sufficient force of men diligently work the same in a skillful and proper manner, during the mining seasons when water can be purchased or had at the rate of twelve and one half cents per inch, and with a sufficient amount of water to work to advantage, when it can be had, and first work up through the Campbell ground, and then otherwise, to the best advantage, to extract, wash out, and clean up the gold contained in said mining ground, and at each clean-up hereafter the said party of the second part agrees to pay over and deliver, in good, clean gold-dust, one third of the gross proceeds of all gold so washed out, extracted, and cleaned up, without delay, as soon as so cleaned up; and out of the remaining two thirds of each clean-up of gold so made hereafter, after deducting all expenses of working said claims during the run, then to pay over and deliver to the parties of the first part whatever gold-dust may remain of such clean-up, and the said gold-dust so paid over and delivered to the parties of the first part at such time of each clean-up shall be applied and credited on this agreement, as a part payment of said purchase money, at the rate of seventeen dollars

per ounce; until the balance of said purchase money is fully paid.

"And the party of the second part also agrees that out of all the gold-dust extracted and cleaned up out of any drift dirt, the full one half thereof, when so-extracted, washed out, and cleaned up, shall be immediately paid over and delivered to the said parties of the first part, and applied and credited on this agreement as a part payment of said purchase money, until the same is fully paid. And the party of the second part fully agrees to keep an account of all the gold-dust washed out, extracted, and cleaned up in the working of said mining ground by the use of said Birch Creek water, used for working said claims in the spring, and to use the same therefor to the best advantage each spring; and out of the gross proceeds of all gold-dust cleaned up by use of said water, to pay over, at the close of the Birch Creek water season, the full one half of such gross proceeds to the said parties of the first part, to be applied as a part payment on the purchase money of this agreement, until the balance remaining due is fully paid. And the said party of the second part agrees to notify said parties of the first part of the time or times of each and every clean-up of said mining claims so worked, and permit them or their agents to be present to witness such clean-up. And the said parties of the first part agree to deliver immediate possession of said premises to the party of the second part, to the end that the said mining ground may be so worked, and the balance of said purchase money of $8,000 so paid from such proceeds of gold extracted therefrom, and from such water rights and ditches in manner aforesaid.

"And the parties of the first part also agree that on receiving the said sum of $8,000, at the times and in the manner above mentioned, or if paid otherwise or sooner by the said party of the second part, they will execute and deliver to the said party of the second part, at their own proper cost, a good conveyance of all their right, title, and interest in and to all said property. It is further agreed and understood by the parties hereto that should the party of the second part make default in any substantial particular in the performance of his part of this agree-

ment, that then the parties of the second part may, at their option, re-enter and take possession of said premises and terminate this agreement, and the party of the second part shall forfeit all right to a conveyance of said property, and all right of possession thereof, and of the purchase money paid thereon, as damages for such default in the performance of his part of this agreement; and it is understood that the stipulations aforesaid are to apply to and bind the heirs, administrators, and assigns of the respective parties; and it is further agreed by the said party of the second part that he shall not sell, assign, mortgage, or pledge his interest in this agreement, or in said property, or any part thereof, or deliver possession thereof, to any person or persons other than the parties of the second, except by permission of the parties of the first part. And it is further understood that this agreement is to sell all the mining claims and property situate in and adjacent to Quartz Gulch, heretofore sold by W. J. Leatherwood to Joseph Manaudas, and by John Campbell to said Manaudas; that all erasures and interlineations herein were made before execution thereof.

"In witness whereof, the parties of the first part nereto set their hands and seals, and the said party of the second part also sets his hand and seal, the day and date first above written.

[SEAL.] "S. A. HEILNER & Co.
[SEAL.] "W. B. BENSON.
"In presence of—JOS. MANAUDAS.
"HERMAN HAAS."

It appears, also, that the respondent occupied and worked the mining ground referred to in said last-mentioned agreement, until the time of the execution of the said agreement, when it was turned over to the said Benson, and thereupon he began working it in accordance with the terms thereof. It further appears that sometime in May, 1879, a suit was commenced in the Circuit Court for said county of Baker, by one James Lynn, against the appellants, respondent, and a ditch company, consisting of Packwood and Carter, to restrain them from running what is termed "tailings" onto Lynn's mining ground, by running water from the ditch of said Packwood and Carter down

through certain flumes of said Lynn, said water supplying said mines referred to in the said written agreement with said Benson; that said suit involved a large expense in procuring witnesses, and on account of attorney's and referee's fees, and other incidental expenses; that it continued pending until the March term, 1880, of said Circuit Court, when it was heard; and on the 4th day of August of that year a final decree was entered therein, and each party required to pay one half the costs and disbursements of the suit, including the fees of the referee and commissioner appointed to execute the decree. A controversy arose in regard to the taxation of the costs and disbursements, and they were not adjusted till July, 1881, at which time they were adjusted by the court upon appeal from the decision of the clerk in the taxation thereof. It further appears that on the 15th day of December, 1880, the respondent and appellants had a settlement of their affairs; that appellants brought forward an account for general merchandise furnished the former, and of money advanced and paid for him, and also accounts of the other firms before referred to, and which accounts contained credits in favor of the respondent for gold-dust and money received from him, also from the proceeds of the mine under the management of said Benson; that in said settlement there was included said accounts of the appellants and the credits of the respondent; and that in the adjustment there was found due from the respondent to appellants the sum of $453. At that time the respondent was about to make a visit to France, and he borrowed from the appellants, through Mr. Cohn, one of the members of the firm, $547, and executed to Cohn, for said firm, his promissory note for $1,000, covering the balance of the account and the borrowed money. It further appears that Benson, when he entered into the agreement with the appellants of July, 1880, did not pay the $1,000 therein agreed to be paid on the execution thereof, but that he executed his promissory note therefor to Heilner, one of said firm, and Mr. Cohn, the other member thereof, indorsed it. Said note was never paid, but is still in the hands of appellants. And it further appears that the appellants paid certain of the costs and expenses of said suit brought by Lynn, and

claim to have paid the following items and to the following named persons, on account of said suit, and that they are entitled to charge the respondent with the amount, viz.: To I. D. Haines, $300; to I. B. Bowen, $172.50; to Grier &. Kellogg, $117; to Mrs. Howard, $27; to John Fenman, $8; to S. H. McLaughlin, $145; to I. B. Bowen, $87.25; to Joseph Shinn (referee's fees), $800; to James Lachner, $96.50; to C. M. Foster, $40; to Lawrence & Shinn, $500; to T. C. Hyde, $119; to E. L. Bradley, $16; to H. Deckman, $46.

Subsequent to the said 15th day of December, 1880, the appellants made the following advancements, to and for the respondent, of money and goods, viz.:—

| | | | |
|---|---|---|---:|
| February 25, 1881. | | Remittance to France | $125 00 |
| April 4, | " | Paid Stearns & Balleray note | 708 00 |
| " 18, | " | Telegraphic Exchange | 105 50 |
| May 18, | " | Cash | 25 00 |
| July 26, | " | Ottenheimer & Co.'s account | 115 00 |
| | | Washington Gulch account | 17 00 |
| | | Kauffman & Co.'s account | 99 00 |

And it further appears that the appellants received from the proceeds of said mine, subsequent to the said 15th day of December, 1880, gold-dust amounting in value to the sum of $1,496.41; that the same was received July 17, 1881.

These general facts are the *data*, as I view the case, from which an adjustment and settlement of the mutual accounts and claims between the parties is to be made. Some questions have been made in regard to the relations of the parties, created by their agreement set out herein, but there can be no serious difficulty from that source. The instrument operated as a mortgage beyond doubt. Another question presented is as to the amount for which the appellants became liable upon the agreement with Benson; but that is easy of solution. The appellants are chargeable with no more than they received from the working of the claim by Benson under the agreement, unless they are to be charged with the Benson note of a thousand dollars. There would be no difficulty in arriving at a correct conclusion if we could ascertain when the expenses of the Lynn suit were paid,

and whether they were included or not in the settlement of December 15, 1880. The respondent insists that the portion thereof he was liable to pay was included in the settlement, but the appellants contend that the respondent is liable for the whole expense paid by them on account of said suit, and that the expense was not included in the settlement; that the suit was not then terminated; and that the bill of items upon which the settlement was made shows that they could not have been included. The counsel who tried the case here seemed to have overlooked the importance of having an account taken between the parties by some competent accountant, and contented themselves with the introduction, at the hearing of depositions. The case should not have been submitted in that style; a good book-keeper would have been much more effective in ascertaining the rights of the parties than a jurist; but the case is here, and we must dispose of it by the aid of such evidence as we have before us, or send it back and have the facts more thoroughly investigated.

The circuit judge who heard the case found that there was a balance due the appellants from the respondent of $531.35. As I understand it, he allowed to the appellants one third of the expenses paid or claimed on account of said Lynn suit, after reducing the referee's fees from $800 to $325, and allowed the thousand-dollar Benson note in favor of the respondent. The basis of his computation may have been just, but I do not see how the result could have been reached, in view of the unsatisfactory character of the evidence, by any certain mode. At least, I feel that the attempt to approach the real truth in the case is a groping effort. It hardly seems equitable to charge the appellants with the Benson note, when they realized nothing therefrom, nor are ever likely to. Again, the appellants have not produced a single voucher showing that they have paid any single item of the expense of said suit. Heilner testified that he had paid the several items before mentioned, but did not state when he paid them, nor were the parties to whom the payments were claimed to have been made produced. Besides, the accounts the appellants exhibited of merchandise and money furnished the respondent prior to said 15th

day of December, 1880, were far from satisfactory, and contained unconscionable charges of interest; but, as the parties settled them, we do not feel at liberty to question there correctness, and would not refer to the matter except as a circumstance tending to raise a suspicion against the other account. In my opinion, it would be doing justice in the case to determine that the debts for which the transfer of the property was made by respondent to secure, and the other indebtedness which has accrued since, have been paid. The appellants have had possession of the property for a number of years. It has been productive, and they have received large payments from respondent, and kept the only account of the transactions we have; and if they have not been able to liquidate the indebtedness under the circumstances, or show by satisfactory proof that it has not been paid, they ought to forgive it, and grant the respondent a jubilee after the manner of an ancient and venerable custom.

There are, however, other circumstances to be considered. A good deal of the property included in the instrument by which the transfer was made to the appellants was never delivered to them, nor did they have possession thereof. That property, of course, should not be included in the decree for a reconveyance, nor should the property that has been sold by appellants, where the respondent has been credited with the price, be decreed to be reconveyed, except upon condition that the respondents pay such price. It appears that the appellants sold the barber shop in Baker City on December 30, 1879, for $675. This may or may not have included said lot 2 of block 2 of Fisher's addition, as described in the contract between appellants and respondent, before mentioned. However that may be, the respondent has been credited with the $675, as will be seen upon the appellants' exhibit of accounts, and he should not have the property back except upon condition that he pay appellants that sum. Under the view suggested, the decree herein should be that the appellants, within sixty days after the entry of this decree in the court below, execute and deliver to the respondent a good and sufficient deed or other instrument of reconveyance of all the property conveyed to them by the conveyance of March 26, 1878, except such personal

property as was not delivered to them or retained by respondent, and except, also, such property as the appellants have sold that was so conveyed to them, and the price therefor has been credited to respondent upon accounts between them which have been settled, unless the respondent pays to appellants such purchase price, and the respondent shall recover costs of this appeal; that the decree appealed from be affirmed, except so far as modified by the decree herein.

Let a decree be entered accordingly.